# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| FIRSTPOWER GROUP LLC, | ) | CASE NO. 5:17-cv-392 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| WD-40 COMPANY, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This matter is before the Court on the motion of plaintiff FirstPower Group LLC ("FirstPower") for a preliminary injunction pursuant to Fed. R. Civ. P. 65, 15 U.S.C. § 1116, and Ohio Revised Code § 4165.03. (Doc. No. 4. ["Mot."].) A single opposition was filed by all defendants (WD-40 Company and WD-Manufacturing Company (collectively, "WD-40" or "WD-40 defendants"); Wal-Mart Stores East, LP, Lowe's Home Centers, LLC, Home Depot, U.S.A., Inc., and Home Depot, Inc.[1] (collectively, the "retail defendants")) (Doc. No. 34 ["Opp'n"]), to which plaintiff replied (Doc. No. 38 ["Reply"]). For the reasons that follow, the motion is denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is a limited liability company organized in Ohio with its principal place of business in Twinsburg, Ohio. (Doc. No. 1 (Complaint ["Compl."]) ¶ 1.) FirstPower has used the EZ REACH trademark in connection with the sale of lubricants since September

---

[1] Defendant Home Depot, Inc. was later dismissed without prejudice by stipulation of the parties. (Doc. Nos. 31 and 35.)

16, 2011. (*Id*. at ¶ 20.) FirstPower is the owner of two EZ REACH trademarks registered with the United States Patent and Trademark Office ("USPTO") for lubricating oil: (1) U.S. Registration No. 4,194,628 (issued August 21, 2012); and (2) U.S. Registration No. 5,074,457 (registered on November 1, 2016). (*Id*. ¶ 27.) These two registered trademarks are part of a "family" of EZ REACH trademarks owned and used by FirstPower: (1) EZ REACH LIFE for oil lubricants (U.S. Registration No. 5,047,436); (2) EZ REACH LIFE for oil lubricants (U.S. Registration No. 5,074,458); (3) EZ REACH RUSTAWAY for oil lubricants (U.S. Registration No. 5,074,474); and (4) EZ REACH CLEAN for cleaning and softening lubricants (U.S. Trademark Application Serial No. 87/272,774). (*Id*. ¶ 36.)

Plaintiff alleges that, notwithstanding WD-40's knowledge of FirstPower's EZ REACH trademarks, WD-40 is using and has attempted to register a virtually identical mark—EZ-REACH—also for use in connection with lubricating oil. (*Id*. ¶¶ 22, 24, 40.) WD-40's attempted trademark applications were rejected by the USPTO because of likelihood of confusion with FirstPower's trademarks. (*See id*. ¶¶ 40, 47, 53, 76, 87, 95.) WD-40's EZ-REACH product is sold by the retail defendants.

On these facts, plaintiff claims that: (1) WD-40 and the retail defendants have infringed its registered trademarks in violation of § 32(1) of the Lanham Act, 15 U.S.C. §1114(1) (counts one and two, respectively); (2) WD-40 and the retail defendants are engaging in unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (counts three and four, respectively); (3) WD-40 has engaged in acts of counterfeiting in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (count five); (4) WD-40's employees and officers are individually, jointly, and severally liable with WD-40 for WD-40's violations of the Lanham Act (count six); and (5) all

defendants are liable for common law trademark infringement and unfair competition, and violation of Ohio's Deceptive Trade Practices Act (counts seven and eight, respectively). The WD-40 defendants counterclaimed for a declaration of non-infringement, invalidity, and cancellation of plaintiff's trademark registrations. (Doc. No. 24 (WD-40 Defendants' Counterclaim) ¶¶ 15-26.)

In its motion for a preliminary injunction, FirstPower argues that it will be irreparably harmed if defendants are permitted to continue using the EZ-REACH mark and selling WD-40's EZ-REACH product. Plaintiff asks the Court to require defendants to cease using and/or otherwise infringing plaintiff's trademark, and to deliver to FirstPower for destruction all product, materials, and information bearing the EZ-REACH mark. (Mot. at 97.[2])

The Court conducted a hearing on plaintiff's motion, and both sides introduced exhibits[3] and presented witness testimony. (*See* Minute Order May 19, 2017.) After plaintiff's motion was fully briefed, but before the hearing, the Sixth Circuit issued its opinion in *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416 (6th Cir. 2017).[4] Like the instant case, *Progressive Distribution* involved reverse

---

[2] All references to page numbers are to the page identification numbers generated by the Court's electronic filing system.

[3] Plaintiff's exhibits are referred to herein as "P. Ex." and defendants' exhibits are referred to as "D. Ex."

[4] In *Progressive Distribution*, the Sixth Circuit affirmed the district court's grant of summary judgment in favor of defendant United Parcel Service.

confusion trademark infringement.[5] At the end of the hearing, counsel for both sides made closing arguments, which included the impact of the *Progressive Distribution* decision on their respective positions.

## II.      STANDARD OF REVIEW

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *CLT Logistics v. River W. Brands*, 777 F. Supp. 2d 1052, 1064 (E.D. Mich. 2011) (quoting *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)). An injunction should be granted "'only if the movant carries [its] burden of proving that the circumstances clearly demand it.'" *Id*. (quoting *Overstreet v. Lexington–Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002)) (further citation omitted). "'[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion.'" *Id*. (quoting *Leary v. Daeschner,* 228 F.3d 729, 739 (6th Cir. 2000)). Plaintiff must "affirmatively demonstrate entitlement to injunctive relief." *Id*.

In determining whether to issue a preliminary injunction, the Court considers four well-known factors: (1) whether plaintiff has established a strong likelihood of success on the merits; (2) whether plaintiff will suffer irreparable harm without an injunction; (3)

---

[5] As the Sixth Circuit has explained:

> A reverse confusion claim differs from the stereotypical confusion of source or sponsorship claim. Rather than seeking to profit from the goodwill captured in the senior user's trademark, the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Progressive Distribution*, 856 F.3d at 425 (quoting *Ameritech, Inc. v. Am. Info. Techs. Corp.,* 811 F.2d 960, 964 (6th Cir. 1987)).

whether issuing an injunction will cause substantial harm to others; and (4) whether an injunction will serve the public interest. *Id*. (citing *Winter,* 555 U.S. at 20; *ACLU of Ky. v. McCreary County, Ky.,* 354 F.3d 438, 445 (6th Cir. 2003)). These four considerations are factors to be balanced, not prerequisites that must satisfied. *Callan v. Fischer*, No. 3:16-CV-734, 2016 WL 6886870, at *1 (W.D. Ky. Nov. 19, 2016) (collecting Sixth Circuit cases). "'Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.'" *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015) (quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000)).

III.    ANALYSIS

A.  **Plaintiff Has Not Demonstrated A Likelihood Of Success On The Merits**

In this reverse confusion case, FirstPower alleges federal and state trademark infringement and unfair competition claims, and a state law claim under Ohio's Deceptive Trade Practices Act. "Regardless of the theory of infringement alleged, a plaintiff must show that there is a likelihood of consumer confusion."[6] *Progressive*

---

[6] Likelihood of consumer confusion is also the test used by the Sixth Circuit for federal unfair competition claims. *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) (citing *Two Pesos v. Taco Cabana,* 505 U.S. 763, 780, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)). The same analysis applies to Ohio's common law infringement and unfair competition, and deceptive trade practices, claims. *Future Lawn, Inc. v. Maumee Bay Landscape Contractors, L.L.C.*, 542 F. Supp. 2d 769, 780 (N.D. Ohio 2008) (citing *ETW Corp. v. Jireh Publ'g, Inc.,* 332 F.3d 915, 920 (6th Cir. 2003)); *Abercrombie & Fitch Stores, Inc.,* 280 F.3d 619, 626 n.2 (citations omitted))); *Stilson & Assocs., Inc. v. Stilson Consulting Grp., LLC,* 129 F. App'x 993, 994 (6th Cir. 2005). Thus, the Court's discussion of the likelihood of success of plaintiff's federal trademark infringement claims encompasses plaintiff's federal claim for unfair competition, and state claims, as well.

*Distribution*, 856 F.3d at 425 (citation omitted). Thus, in order to establish a likelihood of success on the merits, plaintiff must establish that consumer confusion is likely.[7]

The Sixth Circuit utilizes an eight-factor analysis to determine the likelihood of consumer confusion:

> (1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the marks; and (8) likelihood of expansion of the product lines.

*Progressive Distribution*, 856 F.3d at 424 (citing *Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)) (further citation omitted).

There is no mathematical precision in the application of these eight factors. Rather, they are a guide for the Court in determining the "'ultimate question [of] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *Id.* (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)).

### 1. Strength of FirstPower's mark

"The strength of the mark factor 'focuses on the distinctiveness of a mark and its recognition among the public.'" *Id.* at 427 (quoting *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002)). The Sixth Circuit has explained that:

---

[7] The USPTO's rejection of WD-40's EZ-REACH trademark applications based upon likelihood of confusion with FirstPower's registered EZ REACH trademark is not entitled to deference by this Court. The USPTO examiner's likelihood of confusion analysis principally focuses on the similarity of the marks and the commercial relationship between the goods and services. This limited review does not include all factors that must be considered by the Court in a Lanham Act infringement action, including the manner in which the marks are actually used in the market place. Thus, the Court is not obligated to afford any weight to the examiner's incomplete analysis regarding the likelihood of consumer confusion with respect to the parties' marks, and does not do so here. *Progressive Distribution*, 856 F.3d at 425-27.

the strength evaluation encompasses two separate components: (1) conceptual strength, or placement of the mark on the spectrum of marks, which encapsulates the question of inherent distinctiveness; and (2) commercial strength or the marketplace recognition value of the mark.

*Id.* at 428 (internal quotation marks omitted) (quoting *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012)) (further citation omitted).

A mark's distinctiveness and resulting conceptual strength 'depends partly upon which of four categories it occupies: generic, descriptive, suggestive, and fanciful or arbitrary.' *Therma-Scan*, 295 F.3d at 631 (internal quotation marks omitted). A descriptive mark 'specifically describes a characteristic or ingredient of an article,' while an arbitrary mark 'has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers.' *Id.* (internal quotation marks, citation, and brackets omitted).

*Id.*

### Conceptual strength

Plaintiff argues that its EZ REACH marks "are relatively strong" on the spectrum ranging from descriptive[8] to arbitrary, and the registration of its mark with the USPTO demonstrates that the mark is not merely descriptive.[9] Defendants disagree, arguing that

---

[8]  Descriptive marks describe a characteristic or ingredient of the product. *Two Pesos,* 505 U.S. at 769. A descriptive mark is not protectable, but can become a valid trademark if it acquires a secondary meaning and becomes distinctive of the trademark owner's goods. *Progressive Distribution*, 856 F.3d at 428 (citing, among authorities, *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 364 (6th Cir. 1984) (descriptive mark becomes distinctive through advertising and reputation)).

[9]  "[T]he fact that a mark is registered on the principal register creates a presumption that the mark is not descriptive." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1118 (6th Cir. 1996) (citing *Hindu Incense[ v. Meadows]*, 692 F.2d [1048],1050 (6th Cir. 1982))); *Goscicki v. Custom Brass & Copper Specialties, Inc.*, 229 F. Supp. 2d 743, 753 (E.D. Mich. 2002) ("[A] registered trademark enjoys the protection of the presumption of validity, which includes distinctiveness.") (citing *Induct–O– Matic Corp.,* 747 F.2d at 364). The presumption of validity, however, is a separate issue from the inquiry into the strength of a trademark for the purpose of analyzing consumer confusion in an infringement action. *See Schneider Saddlery Co., Inc. v. Best Shot Pet Prod. Int'l, LLC*, No. 1:06-CV-02602, 2009 WL 864072, at *8-9 (N.D. Ohio Mar. 31, 2009) (citations omitted); *Champions*, 78 F.3d at 1118; *Goscicki*, 229 F. Supp. 2d at 753 (citing *Two Pesos,* 505 U.S. at 772). Even when a registered trademark is incontestable, which is not the case here, the registrant's exclusive right to use the mark is not dispositive of the ultimate issue of consumer confusion in an infringement action. *Progressive Distribution*, 856 F.3d at 428-29 (citations omitted).

plaintiff's EZ REACH trademark is descriptive because it describes a characteristic of FirstPower's lubricants—its applicator. (Opp'n at 598.) In support, defendants point to plaintiff's website, which touts its "Extended Reach Applicator" as "ideal for surfaces requiring lubrication which are not accessible for grease or paste application." (Opp'n at 598, emphasis omitted.)

Plaintiff contends that EZ REACH is a suggestive mark. (Mot. at 85.) Suggestive marks describe a characteristic of the product that requires the observer to "use imagination and perception to determine the nature of the goods." *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984). Suggestive and descriptive marks are weak relative to arbitrary and fanciful marks, however, and confusion is less likely where weak marks are involved. *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987); *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) ("The stronger the mark, the more likely it is that encroachment on it will produce confusion.") (citing *Little Caesar*, 692 F.2d at 571); *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004) (AutoZone is a suggestive or descriptive mark and, thus, is less likely to cause confusion.)

It is not necessary for the Court to determine whether FirstPower's mark is descriptive or suggestive for the purpose of this analysis. Even if FirstPower's mark is suggestive with moderate conceptual strength, that determination is only half of the inquiry. In order for a mark to be considered strong for purposes of likelihood of confusion in an infringement analysis, the mark must be *both* conceptually *and* commercially strong. *Progressive Distribution*, 856 F.3d at 430 (citing *Maker's Mark*, 679 F.3d at 419); *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016) (citation omitted);

Even if FirstPower's mark has some conceptual strength, it is commercially weak, and thus considered a weak mark under the *Frisch* analysis. *Progressive Distribution,* 856 F.3d at 430.

### Commercial strength

"A mark's commercial strength depends on public recognition, or the extent to which people associate the mark with the product it announces." *Id*. (citing *Maker's Mark*, 679 F.3d at 419). Surveys and proof of marketing, for example, can be utilized to establish "broad public recognition" of the mark. *Id*. (quoting *Therma-Scan*, 295 F.3d at 632).

Plaintiff has failed to establish the commercial strength of its mark in the marketplace. Plaintiff does not contend that its mark is commercially strong, arguing instead that in a reverse confusion case such as this, the smaller senior user (FirstPower) should not be penalized for its lack of commercial success relative to a powerful junior user (WD-40). (Mot. at 86.) According to plaintiff, in a reverse confusion case the commercial strength analysis should focus on the commercial weakness of the senior user, not its commercial strength. The Sixth Circuit, however, squarely rejected the argument that the commercial strength analysis is different in a reverse confusion case than in a forward confusion case. *Progressive Distribution*, 856 F.3d at 430-31 (discussing and rejecting the dissenting opinion's similar reasoning).

At the hearing on plaintiff's motion, which was conducted after the Sixth Circuit's decision in *Progressive Distribution*, plaintiff offered no evidence of commercial strength of its EZ REACH trademarks through marketing, surveys, or other means to show "broad public recognition" of its mark. The only evidence regarding the

commercial strength of EZ REACH was the hearing testimony of FirstPower's principal, John Harley ("Harley"). Harley testified that he thinks "some" of FirstPower's customers identify EZ REACH as a FirstPower brand, and it is his "hope" that in time, the EZ REACH brand will give FirstPower a competitive advantage.

The evidence before the Court at this time is that FirstPower's mark both lacks conceptual and commercial strength. Thus, the Court concludes that plaintiff's EZ REACH mark is weak with respect to the first factor of the *Frisch* analysis. This weighs against a finding of likelihood of confusion.

### 2. Relatedness of FirstPower's and WD-40's products

The Sixth Circuit has established three benchmarks for the Court to consider when evaluating whether the parties' goods are related:

> First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely. *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003).

*Progressive Distribution*, 856 F.3d at 431-32 (internal quotation marks omitted).

Plaintiff argues that the products are identical because both are lubricating oils and are likely to be connected in the mind of prospective purchasers. (Mot. at 87.) Defendants dispute that the products are related simply because they are both lubricants, and argue that the products are unrelated and not in competition because FirstPower's synthetic oils are designed for and focused on the needs of the electric power industry, whereas WD-40's petroleum based lubricant is a multi-purpose product that is not

suitable for use with electrical equipment.[10] (Doc. No. 34-8 (Declaration of Thomas A. Clark ["Clark Dec."]) ¶¶ 13, 14.)

"Goods and services are not necessarily related just because they 'coexist in the same broad industry.'" *Progressive Distribution*, 856 F.3d at 431-32 (quoting *Homeowners Grp.*, 931 F.2d at 1109). The issue is whether the products are so related that they are likely to be connected in the mind of a prospective purchaser. *Homeowners Grp.*, 931 F.2d at 1109 (citations omitted). "[T]he relatedness inquiry focuses on whether goods or services that are *similarly marketed* and appeal to *common customers* are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Progressive Distribution*, 856 F.3d at 431-32 (internal quotations marks omitted) (emphasis added) (quoting *Therma-Scan,* 295 F.3d at 633) (further citation omitted); *Kibler*, 843 F.3d at 1076-77 (citing *Homeowners Grp.*, 931 F.2d at 1109).

The parties' target customers are discussed below, and their respective marketing methods are discussed later in this opinion.

### *FirstPower's target customer*

At the hearing, Harley testified that FirstPower's target customer is the electric power industry, which uses plaintiff's specialty synthetic oils and cleaners in circuit

---

[10] Plaintiff agrees that WD-40's petroleum based EZ REACH product is not suitable for the same uses as FirstPower's product. Indeed, Harley testified that the consequences of the inappropriate use of WD-40 with electrical equipment (fire, explosion, and equipment failure) would "decimate" FirstPower's EZ REACH brand.

breakers and compressors.[11] Harley's testimony is consistent with FirstPower's response to a USPTO office action regarding FirstPower's trademark application for FIRSTPOWER LIFELINE. FIRSTPOWER LIFELINE is a product kit consisting of cleaners, degreasers, and lubricants available from FirstPower for use by utility companies. The USPTO refused registration of the FIRSTPOWER LIFELINE application based on likelihood of confusion with a previously registered trademark— LIFELINE—for cleaners, degreasers, and lubricants for bicycles. (*See* D. Ex. 29.008.) In responding to the office action, FirstPower argued that consumer confusion was not likely because, among other reasons, "[Firstpower's] goods are intended for use in the field of highly energized electrical equipment." (D. Ex. 29.009.) As discussed in greater deal below, FirstPower's EZ REACH products are only available for purchase on its website, and are expensive.

### *WD-40's target customer*

Timothy Lesmeister ("Lesmeister"), WD-40's director of marketing in the United States, testified at the hearing that WD-40's EZ-REACH product is the same formula as all of WD-40's multi-use products and has been used by its customers for approximately two thousand different applications. According to Lesmeister's testimony, the EZ-REACH Flexible Straw product is targeted to "professional" users and "do-it-yourselfers," whom WD-40 considers to be "heavy users." For do-it-yourselfers, a heavy user is someone who spends more than $20.00 annually on WD-40 or like products. With respect to professionals, the top heavy users are those in the automotive business.

---

[11] FirstPower's website likewise indicates that the electric power industry is the focus of FirstPower's business, dedicated "to the challenges of maintaining the electric power industry's vital equipment and components." (Doc. No. 34-1 at 622.) FirstPower's "lubricant research [has] focused on the needs of the Electric Power Industry since 2010." (*Id.* at 621.)

According to Lesmeister, WD-40 does not now, and does not plan to, target the electric power or electric utility industry. (Doc. No. 34-3 (Declaration of Timothy Lesmeister ["Lesmeister Dec."]) ¶ 7.) Plaintiff has offered no evidence to the contrary. Indeed, the safety data sheet for WD-40 EZ-REACH and/or product container warns customers that its petroleum-based lubricant should not be used around flames, heat, or "any source of electricity." (*See* Clark Dec. ¶ 14.) As discussed in greater deal below, WD-40's EZ REACH product is available from numerous retailers, both online and in brick and mortar stores, and is inexpensive.

The Court concludes that the parties' lubricants are somewhat related because they are both part of a broad category of lubricants, but are not fully related or competitive for a number of reasons, including product composition, intended use, price, and target customer. Accordingly, the Court considers this factor neutral, and likelihood of confusion will turn on the analysis of other factors. *Maker's Mark*, 679 F.3d at 423 (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 282 (6th Cir. 1997)); *see Progressive Distribution*, 856 F.3d at 432 (citing *Therma-Scan*, 295 F.3d at 633).

### 3.  Similarity of marks

Similarity of marks is a factor of considerable weight. *Daddy's Junky Music Stores*, 109 F.3d at 283. In evaluating whether the mark is similar, a court should not examine the marks side by side but instead must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented. *Wynn Oil Co. [v. Thomas]*, 839 F.2d [1183,] 1187 [(6th Cir. 1988)] (internal citations omitted). In assessing similarity, a court should consider the pronunciation, appearance, and verbal translation of conflicting marks. *Leelanau Wine Cellars*, 502 F.3d [504,] 516-17 [6th Cir. 2007] (quoting *AutoZone, Inc.*, 373 F.3d at 795-96).

*Progressive Distribution*, 856 F.3d at 432 (internal quotation marks omitted).

It is true that both marks contain the phrase EZ REACH and sound the same. But that comparison is not the standard for similarity in a *Frisch* analysis. The test is whether the public will be confused when the mark, as actually used in the marketplace, is singly presented. *Id.* at 433 (citing *Homeowners Grp.*, 931 F.2d at 1109) ("Although the respective marks use the same words, the focus of our inquiry is much broader inasmuch as we are obligated to evaluate the marks as they appear in commerce—not just as they appear in black and white.").

In this case, WD-40 uses EZ-REACH in conjunction WD-40's yellow shield emblazoned with WD-40 in blue on WD-40's traditional blue can. (*See* Opp'n at 588.) WD-40's house mark dominates the EZ-REACH mark, which appears in a smaller typeface, and below, the WD-40 shield. In addition, the phrase EZ-REACH appears with the words "flexible straw" and an image of the flexible straw in action. (*See* D. Ex. 26.) As the Sixth Circuit has stated, the inclusion of a house mark can reduce the likelihood of confusion as to any similarity between the marks. This is especially true when a house mark, such as WD-40's yellow shield, is very recognizable and associated with a strong and popular brand. *Progressive Distribution*, 856 F.3d at 433. Plaintiff does not use its EZ REACH mark on its products in any consistent manner or color, and it is commercially weak. (*See* P. Ex. 55, 57, 58, 59, 60, 62, 63, 64.)

Like the Sixth Circuit in *Progressive Distribution* with respect to the UPS house mark, this Court cannot imagine that any reasonable consumer, when looking at WD-40's and FirstPower's marks as they appear in the commercial context on the parties' products, would confuse the two marks. *Progressive Distribution*, 856 F.3d at 433.

14

Accordingly, the Court finds that this factor weighs against a finding of likelihood of confusion.

### 4. Evidence of actual confusion

> 'Nothing shows the likelihood of confusion more than the fact of actual confusion.' *Groeneveld Transp.* [*Efficiency, Inc. v. Lubecore Intern., Inc.*], 730 F.3d [494,] 517 [6th Cir. 2013]. With that said, evidence of actual consumer confusion is not necessary to show likelihood of confusion. *See Frisch's Restaurant, Inc.*, 759 F.2d at 1267. Isolated instances of confusion are insufficient to support a finding of likely confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 299 (3d Cir. 2001).

*Progressive Distribution*, 856 F.3d at 433.

FirstPower concedes in its motion, and counsel confirmed at the hearing, that plaintiff has no evidence of any actual confusion with respect to the parties' EZ REACH marks. (*See* Mot. at 90.) WD-40 is likewise not aware of any confusion regarding its product from any source.[12] Even if there were isolated instances of confusion, which is not the case here, limited confusion is not legally significant. *Progressive Distribution*, 856 F.3d at 434 (citing *Therma-Scan*, 295 F.3d at 635 ("[s]ix confused customers is legally insignificant"); *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 399 (4th Cir. 2009) (four instances of consumer confusion is at best *de minimis*); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (discounting four callers as *de minimis* evidence of confusion)).

WD-40's EZ-REACH product has been on the market since July 2015 and is widely available from numerous retailers large and small, both brick and mortar and online. Given the penetration of WD-40's EZ-REACH product in the marketplace, one

---

[12] WD-40's call center has received 113 telephone calls regarding WD-40's EZ-REACH since the product was launched in July 2015. None of these calls concerned FirstPower's EZ REACH product or any confusion between WD-40's product and any other product. (Lesmeister Dec. ¶ 12.)

would expect that there would be some evidence of confusion if consumer confusion were likely. *Id.* ("We believe that if there are a large volume of contacts or transactions, which could give rise to confusion, and only limited instances of confusion present themselves, then evidence of actual confusion should receive little weight.") (citing 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:14 (4th ed.); *George*, 575 F.3d at 399). In the absence of any evidence of confusion, the Court concludes that this factor weighs against a finding of likelihood of confusion.

### 5.  Marketing channels

> In considering this factor, courts must determine 'how and to whom the respective goods or services of the parties are sold.' *Leelanau Wine Cellars, Ltd.*, 502 F.3d at 519 (quoting *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006)). There is less likelihood of confusion where the goods are sold through different avenues. *Id.* 'Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion [also] decreases.' *Therma-Scan*, 295 F.3d at 636.

*Id.*

The Court has previously discussed the parties' respective target customers in its analysis of the relatedness factor. With respect to marketing channels, Harley testified that FirstPower's EZ REACH products are available on the internet *only* from plaintiff through its website, and are also available through direct sales calls by FirstPower and FirstPower booths at tradeshows and conventions. FirstPower does not sell its products through third-parties, either online or in brick and mortar stores. In order to purchase products through FirstPower's website, Harley testified that customers must establish an account.

In contrast to FirsPower's single website presence, WD-40 EZ-REACH is sold through numerous online and brick and mortar retailers, including big box and discount

retailers. WD-40 also markets its EZ-REACH product through online advertising and social media, print ads, and displays and signage in brick and mortar stores. (*See* Clark Dec. ¶ 12.)

Plaintiff argues that because both products can be purchased on the internet, the parties' marketing channels overlap and confusion is likely. (Mot. at 90-91.) Plaintiff's contention that its product is marketed over the internet is somewhat of a stretch. Unlike WD-40's products, which can be purchased on the internet from numerous online retailers, FirstPower's internet sales and marketing is entirely limited to its website. The parties' internet marketing and sales do not overlap, except to the extent that search engines identify both products. This alone, however, does not support a finding that the products are sold in similar marketing channels. *See Therma-Scan*, 295 F.3d at 637.

The overlap between the parties' marketing channels is *de minimis*, at best.  While there may be some minimal overlap in marketing in the nature of search engine results, the parties' marketing efforts overwhelmingly target different consumers through different channels. *Progressive Distribution*, 856 F.3d at 435 (while some overlap in marketing may have occurred, the parties generally target entirely different consumers and relied upon distinct marketing channels). This factor weighs against a finding of likelihood of confusion.

### 6.  Likely degree of purchaser care

Generally, the standard for determining whether a likelihood of confusion would arise is predicated upon an ordinary buyer exercising ordinary caution. A 'higher degree of care, in contrast, is appropriate where the buyer in question has a particular expertise or sophistication.' *Homeowners Grp*., 931 F.2d at 1111. 'This expectation of greater attention, where appropriate, diminishes the likelihood of confusion.' *Therma-Scan*, 295 F.3d at 638.

*Id*.

Harley testified at the hearing that the electric power companies are generally more sophisticated consumers than industrial companies, and typically have purchasing departments that control and determine what products will be purchased for use by the power company's employees. His testimony regarding the sophistication of FirstPower's customers is consistent with FirstPower's response to the previously referenced USPTO office action regarding FirstPower's trademark application for FIRSTPOWER LIFELINE. In responding to the office action, FirstPower argued that consumer confusion was not likely with the registered trademark LIFELINE for bicycle lubricant because  "[Firstpower's] goods [intended for use with electrical equipment] are such that a consumer would be expected to exercise a high degree of sophistication and make a thorough inquiry prior to making a purchase," and the purchasers of FirstPower's products "would also be highly likely to research the goods for such things as applicability, safety from electric shock, and the effectiveness of the goods as applied to highly energized areas and equipment, the efficiency of the lubricant or oil application,

etc." (D. Ex. No. 29.009.) Experts for both parties also opined regarding the sophistication and care exercised by purchasers of FirstPower's products.[13]

In addition, FirstPower's EZ REACH products are significantly more expensive than WD-40's product, ranging from $638.00 dollars for a lubricating and cleaning kit,[14] to $31.40 for one 110 gram (3.9 ounces) bottle. (*See e.g*. Doc. No. 34-1 at 627-28.) A single 4 ounce bottle of FirstPower's product is three times more expensive than the average price ($9.36) of a much larger (14.4 ounce) can of WD-40. (Lesmeister Dec. ¶ 8.) When potential customers are sophisticated purchasers and the products are expensive, those consumers are likely to exercise more care when making a purchase than the typical buyer exercising ordinary caution, thus reducing the likelihood of confusion. *Leelanau Wine Cellars*, 502 F.3d at 519 (citing *Daddy's Junky Music Stores,* 109 F.3d at 285).

As discussed above, FirstPower sells its expensive specialized products only through the narrow marketing channels of FirstPower's website and direct contact with customers. By comparison, WD-40's inexpensive EZ-REACH multi-use product is available from a multitude of retailers. These circumstances suggest that FirstPopwer's

---

[13] Defendants' expert opined that for numerous reasons, including safety, cost of equipment, desire to reduce equipment failure and damage, and to avoid interruption of service, products used in the electric power industry are carefully reviewed, screened and approved. (Clark Dec. ¶¶ 15-17.) In the view of plaintiff's expert, there is a continuing practice which began in the 1970's and 1980's of "using whatever lubricant you have, including WD-40, in maintaining circuit breakers [and other electrical equipment]" and "the use of lubricants like [WD-40] remains common in maintaining circuit breakers and other . . . electrical equipment." (Doc. No. 38-2 (Declaration of James White ["White Dec."]) ¶¶ 16, 18 (internal quotation marks omitted).) According to White, many technicians believe WD-40 is a suitable lubricant for maintaining circuit breakers and other electrical equipment, and he has been told by customers that WD-40 has been used in their circuit breakers and the circuit breaker did "just fine." (*Id*. ¶¶ 22, 23.) White acknowledged at the hearing, however, that utility companies have purchasing departments, he has seen no evidence that FirstPower markets outside of the electric power industry, and that technicians who believe WD-40 is a suitable lubricant for circuit breakers are not sanctioned purchasers for power companies.

[14] FirstPower's Lube by Number kit contains cleaners and lubricants typically needed for the maintenance of circuit breakers, and contains a LubeGuide to make it easy for technicians and maintenance personnel to identify the right lubricant for each component. (Doc. No. 34-1 at 627; D. Ex. 7.)

customers are likely to exercise greater purchaser care than ordinary care. *See id.* at 519-20 (wine not sold in retail channels but only available for purchase through tasting rooms requires a deliberative process and implies a greater level of consumer care in selection, thus reducing, if not eliminating the likelihood of confusion); *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006) (citing *Homeowners Grp.*, 931 F.2d at 1111). Thus, this factor weighs against a likelihood that FirstPower's customers will be confused regarding the source and/or affiliation of FirstPower's products.

### 7.  WD-40's intent

Courts have held that "[i]f a party chooses a mark with the intention of creating confusion between its products and those of another company, 'that fact alone may be sufficient to justify an inference of confusing similarity.'" *Therma-Scan*, 295 F.3d at 638 (quoting *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286).

*Progressive Distribution*, 856 F.3d at 435-36.

The only evidence advanced by plaintiff of WD-40's intent to infringe FirstPower's trademark is that WD-40 was aware of plaintiff's mark. FirstPower argues that WD-40's trademark applications for EZ-REACH, and repeated rejection by the USPTO based on likelihood of confusion with FirstPower's registered EZ REACH trademark, demonstrates intentional infringement by WD-40.

While an inference may be drawn from WD-40's knowledge of FirstPower's trademark that WD-40 was at least aware of a possibility of confusion, "knowledge of a trademark, alone, will not support a finding of intent to confuse if other circumstances show that the defendant believed there was no infringement." *Id.* (citing *AutoZone*, 373 F.3d at 800). At the hearing, WD-40 presented evidence that it did not believe confusion

of FirstPower's mark with WD-40's EZ-REACH was likely because: (1) FirstPower is not a competitor of WD-40; (2) WD-40 and FirstPower target different customers; and (3) the distinctive WD-40 trade dress of the EZ REACH product is entirely different from FirstPower's trade dress. WD-40's director of marketing testified that "we had never even heard of FirstPower," and that in selecting EZ-REACH, WD-40 did not intend to confuse FirstPower's customers. Rather, the EZ-REACH Flexible Straw was an evolution of WD-40's SMART STRAW, and part of a decade long strategy by WD-40 to offer customers different delivery systems for its multi-use products.

Plaintiff has offered nothing more than WD-40's knowledge of FirstPower's mark to evince an intent to infringe. WD-40, on the other hand, has advanced specific reasons that it did not intend to cause confusion and believed that confusion between the two marks was unlikely. Under these circumstances, the Court concludes that this factor is neutral in the likelihood of confusion analysis.

### 8.  Expansion of product lines

A 'strong possibility that either party will expand his business to compete with the other . . . will weigh in favor of finding that the present use is infringing.'

*Rohn v. Viacom Int'l, Inc.*, No. 1:14-CV-83, ---F.Supp.3d---, 2017 WL 1081291, at *9 (W.D. Mich. Jan. 27, 2017) (quoting *Daddy's Junky Music Stores*, 109 F.3d at 287 (internal quotation marks omitted); *see Champions*, 78 F.3d at 1121-22.

FirstPower claims that it has plans to introduce its products "into the broader industrial market" by the end of 2017, and there is a "likelihood that FirstPower will expand its business further to compete with the WD-40 Defendants." (Mot. at 93.) According to plaintiff's expert, plaintiff's EZ REACH lubricant is not limited to use on

high voltage circuit breakers in the electric power industry, but is also "recommended" for use in low and medium voltage applications. (Doc. No. 38-2 (Declaration of James White ["White Dec."]) ¶ 13.) While that may be true, FirstPower has provided no written evidence of any expansion plans and Harley did not provide any such evidence at the hearing. Moreover, even if FirstPower expands its business into low and medium voltage applications, the parties agree WD-40's EZ REACH is unsuitable for electrical applications of any voltage.[15]

Expansion plans are only relevant to the likelihood of confusion analysis if such plans bring the parties into competition with the other. Plans to expand businesses that are not in competition with each other, and/or whose products are not marketed to the same consumer, are not relevant to the analysis. *Homeowners Grp.*, 931 F.2d at 1112 (this factor is relevant only where a party expands its business to compete with the other or to market to the same consumers). Moreover, a "'finding of little evidence of expansion plans is accorded little to no weight' in the likelihood of confusion analysis." *Rohn*, 2017 WL 1081291, at *9 (quoting *Maker's Mark*, 679 F.3d at 424). Thus, the Court accords FirstPower's expansion plans little weight.

### 9. Balance of *Frisch* factors weighs against a likelihood of confusion

Having considered all eight *Frisch* factors in analyzing the likelihood of consumer confusion, not a single factor weighs in plaintiff's favor of finding that confusion is likely. While the Court concluded that some factors were neutral, the majority of factors weigh against a finding of likelihood of confusion.

---

[15] FirstPower also "believes there is a strong likelihood that WD-40 Defendants will expand their business to compete with FirstPower's core customer base of industrial companies and electric utilities[.]" (Mot. at 93.) Plaintiff has advanced absolutely no evidence of this, and WD-40's director of marketing directly testified to the contrary.

On balance, the Court finds that consumer confusion between the parties' marks is unlikely. Thus, plaintiff has failed to establish that it is likely to succeed on the merits of its infringement, unfair competition, and deceptive trade practices claims.[16] This factor strongly weighs against issuing injunctive relief, and may be fatal to plaintiff's motion. *O'Toole*, 802 F.3d at 788.

### B.  Plaintiff Has Not Demonstrated Irreparable Harm

In order to establish irreparable harm, plaintiff must show that the harm is "actual and imminent," not speculative or unsubstantiated. *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citations omitted). "Such harm must be 'likely,' not just possible." *Tri-Cty. Wholesale Distrib., Inc. v. Wine Grp., Inc.*, 565 F. App'x 477, 482 (6th Cir. 2012) (quoting *Winter*, 555 U.S. at 22). Harm is irreparable if it is not fully compensable by monetary damages. *Tri-Cty. Wholesale Distrib.*, 565 F. App'x at 482 (citations omitted).

Plaintiff contends that a finding of likelihood of confusion is sufficient to satisfy the irreparable harm factor of an analysis for injunctive relief. (Mot. at 82.) This argument fails, however, because the Court has found that confusion is not likely.

Plaintiff also argues that as a result of defendants' alleged infringement, FirstPower is losing sales, its product identity and competitive advantage, and the ability

---

[16] Plaintiff does not argue that it is entitled to a preliminary injunction on its claim for federal counterfeiting (count five). Counterfeiting is a subset of trademark infringement. *See Ohio State Univ. v. Skreened Ltd.*, 16 F. Supp. 3d 905, 911 (S.D. Ohio 2014) (citations omitted). If plaintiff is not likely to succeed on the merits of its federal infringement claims, it is not likely to succeed on the merits of its federal counterfeiting claim.

to control its goodwill, reputation,[17] and ability to move into new markets. (Mot. at 95; *see* Doc. No. 4-2 (Declaration of John W. Harley ["Harley Dec."]) ¶¶ 28, 31-35.) At the hearing, plaintiff also argued that if even one user of WD-40's product on an energized circuit breaker experienced a catastrophic incident, FirstPower's EZ REACH brand and reputation would be severely damaged.

In opposition, defendants contend that plaintiff has failed to establish irreparable harm for multiple reasons. First, plaintiff has not demonstrated that it has actively promoted its EZ REACH trademark or has a financial stake in the trademark, and offers nothing more than mere speculation regarding loss of sales, product identity, goodwill, and reputation. Second, there has been no evidence of actual confusion regarding the trademarks or of any event or incident that would support a conclusion that FirstPower will be irreparably harmed without an injunction.

At the hearing, plaintiff offered no evidence of consumer confusion, loss of market share, damage to reputation, or of a catastrophic incident during the almost two years that the products have coexisted on the market—only Harley's "fears" in that regard. Plaintiff has made no showing that irreparable harm resulting from WD-40's continued use of EZ-REACH was "'both certain and immediate, rather than speculative or theoretical.'" *Tri-Cty. Wholesale Distributors*, 565 F. App'x at 485 (quoting *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 154 (6th Cir. 1991)).

---

[17] Plaintiff cites *CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 596 (6th Cir. 2015) in support of its argument that irreparable harm exists where a party shows that it will lose control over the reputation of its trademark. *CFE Racing* is factually distinct from this case, however, where a jury found that BMF Wheels' trademark created a likelihood of confusion with plaintiff's trademark.

Unsubstantiated allegations of irreparable harm are an insufficient basis upon which to grant plaintiff injunctive relief. *See Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, No. 4:06CV114, 2010 WL 3370286, at *2 (N.D. Ohio Aug. 26, 2010), *aff'd,* 511 F. App'x 398 (6th Cir. 2013). Accordingly, the irreparable harm factor weighs against injunctive relief.

### C. An Injunction Would Cause Substantial Harm To Others

With respect to the third factor, the Court must consider whether substantial harm to others will occur if an injunction is issued. "[I]f the movant can show a likelihood of success, then the harm to others caused by an injunction will likely consist in part of the non-movant's lost profits from sales of the apparently infringing articles and a loss of the money expended on promotional materials and advertising. Such harm caused to apparent infringers, however, is not entitled to consideration in assessing the harm caused by an injunction." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1461 (S.D. Ohio 1990) (citation omitted).

In this case, however, the Court has concluded that plaintiff is not likely to succeed on the merits of its federal and state claims for infringement, unfair competition, and deceptive trade practices. Plaintiff has not shown that it will suffer irreparable harm if an injunction is not issued. On the other hand, if an injunction were issued and WD-40 was required to cease selling the EZ-REACH product, and retailers were required to remove the product from their shelves, then WD-40 would be required to repurchase all of the retailers' WD-40 EZ-REACH inventory and defendants' lost profits from product sales are estimated to exceed $80 million dollars over five years. (*See* Lesmeister Dec. ¶¶ 13-14.)

Based on the record at this time, the Court concludes that defendants will experience a tangible harm if an injunction is issued, and that harm outweighs any potential harm to plaintiff if an injunction is not issued. *See D & J Master Clean, Inc. v. Servicemaster Co.*, 181 F. Supp. 2d 821, 831 (S.D. Ohio 2002) (substantial harm to defendant outweighs a few misplaced customer inquiries received by plaintiff); *Procter & Gamble Co. v. Georgia-Pac. Consumer Prod. LP*, No. 1:09-CV-318, 2009 WL 2407764, at *10 (S.D. Ohio Aug. 3, 2009) (citing *Frisch's,* 759 F.2d at 1270 (considering potential substantial costs to non-movant as factor in denying injunction)). Accordingly, this factor weighs against granting plaintiff's motion for injunctive relief.

### D.  An Injunction Is Not In The Public Interest

The final factor for the Court to consider is whether issuing an injunction would serve the public interest by advancing the goals of trademark law: "preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark[.]" *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006) (citing *Ameritech, Inc. v. Am. Info. Techs. Corp.,* 811 F.2d 960, 964 (6th Cir. 1987)). Where plaintiff has not established a likelihood of success on the merits, an injunction would not serve the public interest. *D & J Master Clean*, 181 F. Supp. 2d at 832. Plaintiff has failed to establish the final prong of the preliminary injunction standard.

## IV.    CONCLUSION

The Court has considered all four factors of a preliminary injunction analysis. For all of the foregoing reasons, the Court finds that plaintiff has failed to affirmatively demonstrate that the circumstances of this case clearly demand injunctive relief. Accordingly, plaintiff's motion for a preliminary injunction is denied.

**IT IS SO ORDERED**.

Dated: July 18, 2017

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**